(No. 84-CC-064█ )

JONATHAN CHILDRESS, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Order filed December 18, 1984.*

JONATHAN CHILDRESS, *pro se*, for Claimant.

NEIL F. HARTIGAN, Attorney General (HANS G. FLADUNG, Assistant Attorney General, of counsel), for Respondent.

MONTANA, J.

This is a claim brought by Jonathan Childress, a resident of Stateville Correctional Center, for personal injuries when his cell door was closed on his right hand.

On September 23, 1982, Claimant was transported from his cell in E house to a cell in F house. He was then taken to see an investigator and ultimately returned to his new cell in F house around 10:00 p.m. Claimant was handcuffed with his hands behind his back while escorted to the investigator. The normal procedure for removing the handcuffs from a handcuffed prisoner is for the prisoner to enter his cell, which is then closed, and the prisoner is directed to stand with his back to the cell door. The officer reaches in through a chuck hole (or

feeding hole) in the door and removes one handcuff. The prisoner then sticks his other hand out through the chuck hole and the officer removes the remaining handcuff.

In this case, after Claimant entered his cell, the cell door remained partially open (two or three inches) instead of being fully closed. The guard reached in through the chuck hole and removed the handcuff from Claimant's right hand. When Claimant bent over to stick his left hand out through the feeding hole, he raised his right arm and rested his right hand against the door frame of the still open door. Claimant did not know that the doors were operated electrically. In E house, where Claimant had come from, the doors opened and closed manually. Claimant had never been in F house before and did not know the doors were closed electrically. While Claimant had his free right hand resting on the door frame between the partially opened door and the frame, the guard in the central tower closed the door on Claimant's hand.

Since the cell was about a half story higher than the tower, the Claimant could see the guard in the tower and the guard in the tower could see Claimant at all times.

Although Claimant thought the guard removing the handcuffs had closed the door, when he asked the guard to open the door, the guard turned around and waved to the guard in the tower to open the door.

The incident caused Claimant to be in pain and he asked for medical attention. Although the guard said he would send somebody up, nobody came to attend to Claimant. By morning the hand was swollen three to four times its normal size. (R. 21.) Claimant was then taken to the institution hospital where the doctor

examining Claimant told him there was no fracture. Claimant insisted that there had been a fracture and after the doctor took additional X rays it developed that there was an oblique fracture involving the first metacarpal and a transverse fracture involving a distal phalanx of the right middle finger. The doctor could not put a cast on it because of the swelling. He prescribed hot packs and a week later he put a cast on the hand.

The following colloquy took place between Claimant and the commissioner:

"Q: Now, then your complaint is then that you received no treatment the night of the injury? Is that what your complaint is?

A: Yes.

Q: You are not complaining about the treatment you received after you finally got to see the medical personnel?

A: No.

Q: Now, I acknowledge that you were in pain and that your hand had swollen, but in what way would your medical condition be any better if you had gone to the doctor that night?

A: They could have given some type of treatment, something for the pain.

Q: Something for the pain?

A: Yes.

Q. How soon after the incident did you notice that your hand was swelling?

A: I woke up the next morning, it was swollen.

Q: Okay. You went to sleep though before you saw, before you noticed it?

A: It was swelling a little.

Q: Now, describe the pain. How did your hand feel when you woke up in the morning?

A: It was stiff. I couldn't move it. I could barely move the tips of my fingers.

Q: Because of the swelling?

A: Right.

Q: But you weren't feeling any pain from the incident?

A: Yes, I was feeling pain.

Q: How did it feel?

A: Sharp.

Q: Let me see if I am summarizing this correctly. Your complaint about the medical treatment is that you are saying that you should have been able to see medical personnel immediately following the incident rather than having to wait until the following morning?

A: Yes.

Q: But once you got the medical treatment, you are not saying that you were dissatisfied with what the doctor did.

A: No."

Claimant also complains of some partial permanent disability resulting from the incident. His testimony on this point is reproduced in full:

"Q: . . . How is your hand now?

A: It is all right. I still have a knot in it but it is okay.

Q: So you don't feel that you have any permanent injuries from this incident?

A: I can't say for sure. Like I say all of the swelling is stuff still hasn't left out of it. I haven't seen the last x-rays that they had took after they took the cast off to see whether the bone mended back together or what. They said it would be some time before it would be all the way healed.

Q: Were there any bones broken?

A: It was cracked in two different spots.

Q: Which bone was that?

A: Here and there.

Q: It is in the hand?

A: Yes.

Q: Not in the fingers?

A: No. It is in the hand.

Q: Do you have any trouble using your fingers?

A: No, I don't.

Q: You can close your fingers just as well with your right hand as you can with your left hand?

A: I can't close it as tight as my left.

Q: Let me see your hand. Does it show any evidence of the injury?

A: Like I say. It still has a knot right in here. You could feel it right there on the bone." (R. 6-7.)

Additionally, Claimant testified:

"Q: But you don't really have any permanent injury from the door closing on the hand?

A: Yes, I do.

Q: The knot that is what you are talking about?

A: Yes.

Q: All right. Now, let me see your hand again?

A: Right there.

Q: But does that affect you in any way?

A: Like I said I can't tighten my hand all the way up. I know it is not the way that it is supposed to be.

Q: How old are you?

A: I am 31.

Q: How long have you been here?

A: 3 years.

Q: Before you came here, what kind of work did you do?

A: I was a cosmetologist.

Q: You mean you worked in a beauty salon or something like that?

A: Yes.

Q: When will you be released from here?

A: In '88.

Q: Will you go back and do that same type of work?

A: I don't know.

Q: Well, will this in any way affect your ability to earn a living?

A: I don't know. I can't really say at the time.

Q: You have never done manual work?

A: Yes, I have.

Q: What kind?

A: Quite a few. Gardening, landscape.

Q: Are you on any work details now?

A: Yes, I am.

Q: What?

A: I am a clerk.

Q: Do you find any inconvenience in your work as a clerk caused by your hand?

A: It is not any inconvenience in my clerk work but it inconvenienced me being on the weight-lifting team and things like that.

Q: How does it affect you on the weightlifting team?

A: Like I say I can't ball my hand up all the way tight.

Q: Since the time the door closed on it?

A: Yes, I was on the weightlifting team before the injury happened and I was assigned back to the weightlifting team about two months ago trying to exercise to see if the strength will come back in the hand. So far it hasn't.

Q: How long did you suffer pain?

A: What do you mean?

Q: For how long was your hand in pain from having the door close on it?

A: Until it got well.

Q: How long?

A: I would say what, four months." (R. 18-20.)

Respondent called Dr. Gartrell King, medical director at Stateville Correctional Center, as a witness. Dr. King was not the treating doctor, but testified from Claimant's medical records.

At the request of the commissioner, Dr. King examined Claimant's right hand (R. 32-35). He found slight tenderness over the right second metacarpal, found that the hand appeared to be "grossly unremarkable," could not say with a reasonable degree of medical certainty, based on the information that he had, that the knot on the back of Claimant's hand was caused by the fracture, and found that the patient appeared "to have substantial ability to grip with his right hand."

It is clear that Claimant proved a *prima facie* case of negligence on the part of Respondent. The instrument causing the injury was totally under control of Respondent, and Respondent called no witnesses to explain how the incident occurred.

As held by this Court in *Westchester Fire Insurance Co. v. State*, 27 Ill. Ct. Cl. 327:

"When a thing which has caused an injury is shown to be under the management of the party charged with negligence and the accident is such as in the ordinary course of things will not happen if those who have such management use proper care, the accident itself affords reasonable evidence, in the absence of an explanation by the parties charged, that it arose from want of due care."

Claimant was not guilty of contributory negligence because of his unfamiliarity with F house and specifi-

cally, its electronic doors. Moreover, the guard removing Claimant's handcuff did not warn him not to rest his hand on the door frame or in any other manner advise him of safe procedures.

Although in the departmental report Warden DeRobertis offered the conjecture that Claimant injured his hand in a fight prior to being taken to segregation, Respondent called no witnesses to support this conjecture. In fact, Respondent introduced Claimant's medical records which include Claimant's resident injury report which recites that Claimant caught his right hand in a cell door.

Claimant failed to prove substantial permanent injuries, but he obviously experienced pain and suffering. The failure of Respondent to furnish Claimant with emergency medical treatment increased Claimant's pain and suffering.

It is hereby ordered that Claimant Jonathan Childress be and hereby is awarded the sum of one thousand dollars ($1,000).